## UNITED STATES v. BRUNO.

### No. 9055.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 25, 1946.

Decided Feb. 15, 1946.

Writ of Certiorari Granted May 13, 1946.

See 66 S.Ct. 1021.

George R. Sommer, of Newark, N. J., for appellant.

Edgar H. Rossbach, of Newark, N. J., for appellee.

Before BIGGS, GOODRICH, and O'CONNELL, Circuit Judges.

GOODRICH, Circuit Judge.

The defendant was prosecuted by information for having unlawfully sold waste paper at a price higher than the ceiling set.[1] The information was in five counts, each count charging the sale of a separate carload of the paper. The defendant was found guilty on each count. The one question before us on this appeal is the sufficiency of the evidence to sustain the conviction. Defendant's rights on this question were preserved by appropriate motion at the close of the government's case and again at the close of all the testimony.

[1] Maximum Price Regulation 30, as amended, issued pursuant to Emergency Price Control Act of 1942, 50 U.S. C.A.Appendix § 901 et seq.

The price allegedly charged was $1.75 per hundred weight (maximum price for assorted Kraft) while the price that allegedly should have been charged was $1.15 per hundred weight (maximum price for Corrugated).

The defendant, Louis Bruno, is in charge of a small corporation which buys and sells waste paper. At the time of the events in question it was owned by Bruno's sister-in-law. The undisputed testimony shows that the sales were made as follows: Bruno received, from time to time, orders from a broker in this type of merchandise named Carrano. Carrano had offices in New York. He ordered from Bruno the various cars of waste paper of a type called "Kraft" which, we understand, is ordinary brown wrapping paper. The cars were loaded with paper, the cars were sealed and invoices for the shipment as Kraft waste paper sent to Carrano. The paper did not go to Carrano, however. It was sent in the sealed up cars, at his direction, to the consignees. There were two concerned in the events here, one in Ohio and the other in New York. One received three of the cars; the other one two. Carrano never saw the paper. The invoices were for the ceiling price. It appears, without dispute, that the cars did not contain Kraft paper. They contained some Kraft and some corrugated and, in some instances, miscellaneous waste paper. All this is clearly established and no one denies it. If this was all we had to the case a clear violation would, obviously, be proved. We have an order for Kraft paper, a shipment of inferior quality invoiced at the Kraft paper price and then payment by Carrano at invoice price.

That, however, is not all there is to the story from the government's witnesses. It is also proved that the orders from Carrano to Bruno and the orders from the consignees to Carrano were subject to check by the consignees at destination. According to the witnesses, still for the government, this was in accordance with business custom. It appeared that when an order was given by a broker to a shipper such as Bruno, the shipper in filling the order would invoice it to the broker in accordance with the terms of the order. Then the broker paid the shipper, as Carrano did here. If the shipper were a stranger to him he might hold back part of the price until the factory reported on

quality. But if the shipper had an established relationship the broker would advance the money to the shipper according to invoice and then charge it back to him, or deduct it on the next payment if the factory reported a deficiency in quality. The shipper was not compelled to accept the factory's report on quality. He had a chance, if he wished, to call back the shipment or direct its consignment elsewhere. It was also in the testimony that in times like the present, with paper very scarce, the shipper would customarily fill up the car with whatever he had on the assumption, as proved by experience, that the factories were very glad to have any kind of paper they could get.

Both the representatives of the consignees who have testified and Carrano, the broker, were clear and explicit in their statements that the ultimate price paid was not more than ceiling. All of this testimony, it should be repeated, developed in the government's case in chief.

 What basis have we for saying the jury was at liberty to disbelieve all this explanatory testimony and find the defendant guilty as charged? We are not proceeding on the theory that the government having presented certain persons as witnesses is irrevocably bound by what they say.[2] Without that, however, it is the government's burden to establish the guilt of the defendant and it must win on the strength of its own case, not the weakness of that of the accused. The method of transacting business in this fashion does not startle us. While we do not wish to press the limits of judicial notice to extremes, we do know it to be the fact that some businesses are conducted in this way and that the business of selling waste paper is also included does not seem inherently improbable.

The government points to two pieces of testimony which it thinks demolish the explanation of innocence. When an OPA investigator went to see Bruno and look at his books he found that the entries in which these shipments were charged to Carrano were for a sum less than the invoices sent Carrano indicated. The ex-

---

[2] This doctrine is severely criticized in 3 Wigmore on Evidence (3rd ed.) 385 § 897, "The primitive notion, that a party is *morally bound by the statements of his witnesses,* no longer finds defenders, although its disappearance is by no means far in the past. In the early 1800's the judges were still engaged in repudiating this false notion of the basis of the rule against impeaching one's own witness: [citing early precedents]."

planation that Bruno gave to the investigator was that this was the way Bruno had augmented his salary. This "commission" had been arranged with his brother he said. The books, themselves, according to the testimony, showed neither payments of the invoices by Carrano nor evidence of charges back, by Carrano, because of discrepancies between invoice and shipments.

This bit of testimony, it may be granted was suspicion creative. But concerning what does it create suspicion? It may well tend to discredit Bruno as a witness by reason of its improbability. It may also tend to show that he was wrongfully taking money from the concern by whom he was employed. But he was not being prosecuted for that. We do not see that it bears one way or the other on the question whether he sold waste paper above ceiling prices.

The other circumstance is that debit memoranda issued by Carrano against the shipments, or some of the shipments, involved in the transactions which were the subject of prosecution, came after it was known that an OPA investigation was in progress. This fact has some significance it may be granted. The significance, however, is greatly decreased when it is ob-served that the time between the OPA inspection and the memoranda is comparatively close.[3] There was testimony, also, that in this particular period reports from the factory to the broker were not as prompt as they were in less confused times. As against this circumstantial evidence, Carrano had testified that he always made the charges back when the goods did not correspond with invoice.[4]

■ There is inferential innuendo, although not outright statement, that perhaps the broker and the buyers as well as the shipper were lacking in frankness and that possibly all may have been involved in purchases and sales above ceiling prices.[5] We quite realize the difficulty under which the government agency works in trying to get its facts, the revelation of which may be unpleasant to the several parties of a transaction. Nevertheless, if a man is to be convicted of a crime it must be proved, not left to conjecture or suspicion. Disregarding altogether defendant's testimony here we still cannot find in the testimony of the government's witnesses or the permissible inferences to be drawn therefrom enough to sustain the conviction of this defendant.

Reversed.

---

[3] Thus Francis C. Duffy of the OPA testified that on April 6, 1944 he graded and inspected cars, P.R.R. 92203 and C. B.Q. 22160. The debit memos from Carrano to the Bruno concern, in the exhibits, show a date of April 13, 1944 for both.

[4] We have only a small sampling of all the debit memos passing between the parties in the general course of their business. It is therefore interesting to note, and of more than incidental significance, that Bruno's testimony that on occasions the material billed as No. 1 Assorted Kraft was better stock is borne out by at least one of the exhibits in the record. The memo of April 13, 1944 on car No. P.R.R. 92203, referred to in note 3, showed that the shipment, in addition to corrugated which is inferior to No. 1

Assorted Kraft, contained Kraft Bag Waste which is superior stock with a price considerably higher than No. 1 Assorted Kraft. The Kraft Bag Waste is billed at $2.80 cwt. of which $.05 apparently represents a charge for handling etc. The ceiling on the No. 1 Assorted Kraft as pointed out in footnote 1 is $1.75 cwt. plus a similar small charge for handling etc.

[5] In addition to lack of affirmative evidence on this point, we must bear in mind the facts of footnote 4 as well as the undisputed nature of the testimony by the government's own witnesses contra. The rather primitive bookkeeping and unbusinesslike merchandising methods of the Bruno concern are chiefly responsible for these vague intimations by innuendo.